UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VINCENT LEE, | : | CIVIL ACTION NO.: |
| *Plaintiff* | : | 3:02CV2214(AWT) |
| | : | |
| V. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF MOTOR VEHICLES | : | |
| AND DALE URSIN, | : | |
| *Defendant*s | : | JANUARY 26, 2005 |

**DEFENDANTS' LOCAL RULE 56(a)(1)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56, defendants State of Connecticut, Department of Motor Vehicles ("DMV") and Dale M. Ursin ("Ursin") hereby submit their statement of facts as to which there is no genuine issue to be tried.

**A.   Lee's DMV Employment Through December of 1999**

1.   Vincent F. Lee commenced work with DMV as a Management Analyst 1 sometime in 1992 after being laid off from his position with the State Library, Office of Public Records Administrator. (Exhibit 16, Excerpts from Deposition of Vincent Lee, dated October 5, 2004, hereinafter "Lee depo."[1] at pp. 29, 30, 33, 34)

2.   From 1992 through 1997, Lee worked under a number of different supervisors. (Ex. 16, Lee depo. at pp. 36, 38). In 1998 or 1999, Steve Dodge became

---

[1]   Relevant portions of the Lee deposition are submitted herewith as Exhibit 16.

Lee's immediate supervisor and Charles "Chuck" Micelli supervised Dodge. (Ex. 16, Lee depo. at p. 75; Exhibit 13, Dodge Affidavit at ¶ 6).

3. Lee's annual performance ratings were at the level of "satisfactory" or better during the period 1992 through 1999. (Ex. 16, Lee depo. at p. 75).

4. During 1999, Steve Dodge and Charles Micelli discussed the possibility of re-classifying the Management Analyst 2 positions of Daniel Silbo and Mark Silbo to Program Coordinator to reflect the actual duties and responsibilities Daniel Silbo and Mark Silbo were assuming. (Ex. 13, Dodge Aff. at ¶ 10).

5. There were two programs or functions maintained by the DMV Organizational Development Unit in 1999 which justified the creation of two Program Coordinator positions in the Unit. (Ex. 13, Dodge Aff. at ¶ 11).

6. In 1999, neither Mr. Micelli nor Mr. Dodge considered Lee a viable candidate for reclassification of his Management Analyst 2 position to Program Coordinator because Lee did not perform duties or assume responsibilities at the level of Program Coordinator as had Daniel Silbo and Mark Silbo. (Ex. 13, Dodge Aff. at ¶¶ 12, 13).

7. At some point in 1999, Lee asked to meet with Ursin because Lee's supervisor, Micelli, was not available. At that time, Lee related his concern that a co-worker had not invited him to attend a particular Business Process Management meeting. Lee stated to Ursin that he felt he should have been invited. At no time during their discussion did Lee state or imply to Ursin that his race had anything to do with his not being invited to the meeting. (Ex. 2, Ursin Aff. at ¶ 10; Ex. 16, Lee depo. at pp. 92-93).

8.	At some point after 1997, Lee discussed his role with Ursin in DMV's Planning and Research Unit.  Lee never stated to Ursin during that discussion that he felt he was being "marginalized" in the Planning and Research Unit because of his race.  (Ex. 16, Lee depo. at p. 89).

9.	Lee has never filed a complaint with DMV's Affirmative Action Office concerning his work conditions at DMV.  (Ex. 16, Lee depo. at p. 109).

10.	Dale Ursin retired from his employment by the State of Connecticut, DMV on March 1, 2001.  (Ex. 2, Ursin Aff., at ¶ 4).

**B.	The December 22, 1999 Allegations and DMV's Investigation**

11.	On December 22, 1999, the DMV Human Resources Unit received a fax addressed to "Human Resources Director" from an individual named Sharon Gordon ("Gordon").  (Exhibit "2A").  The fax consisted of four pages and had a cover sheet from "Rensselaer at Hartford."  (Id.)

12.	The fax message from Gordon stated:

> I'm sending this fax to the dept. of motor vehicles dept. hoping that I can get this problem resolved.  I'm receiving threatening phone calls on my life and my family from Mr. Vincent Lee who works in the dept. of human resource development dept. yesterday I along with another co-worker received a e-mail from Mr. Lee from his work place, which we found very strange being that we did not personally give Mr. Lee this information.  I would like to see this matter taken care of.

(Ex. "2A", p. 2.)

13. Attached to the fax was a copy of an e-mail dated December 21, 1999 from Gordon to Lee. The e-mail stated:

> I'm informing you, at this very moment human resources are discussing the call you made on my life with the receptionist. Since I'm on their property by law they will have to report this to the police dept. sincerely: Sharon Gordon

(Ex. "2A" at p. 3).

14. The fax to DMV also referenced an e-mail which Gordon stated had been sent by Lee to her co-worker from Lee's state computer. (Id.; Exhibit 2, Ursin Affidavit, at ¶ 17).

15. The Gordon fax was delivered to Ursin on December 22, 1999. (Ex. 2, Ursin Aff. at ¶ 15). Prior to his receipt of the Gordon fax, Ursin had had no contacts with Gordon nor did he recall ever meeting her. (Id. at ¶ 19). Ursin was familiar with Rensselaer, however, because DMV had previously contracted with the school to provide training programs for DMV personnel. (Id. at ¶ 18).

16. After receipt of the fax by DMV, it was determined that the sender, Gordon, should be contacted in an attempt to confirm whether the allegations contained in the fax were, in fact, being lodged against Lee. (Ex. 2, Ursin Aff., ¶ 20).

17. Ursin placed a call to Gordon on speakerphone in the afternoon of December 22, 1999 in the presence of Steve Shonta, DMV's Principal Personnel Officer for Labor Relations and Anne Fairbanks, Personnel Assistant. (Id. at ¶ 22).

18. During the December 22, 1999, speakerphone conversation, Gordon told the DMV representatives that Lee was threatening her and her family and that she wanted the threats to stop. Gordon also stated that she and Lee had previously been involved in a relationship but that she was being contacted by Lee on multiple occasions throughout the day. Gordon also told the DMV representatives that when Lee's calls and e-mails became too "perverted" she attempted to stop them. Gordon also stated in the speakerphone conversation that two of her co-workers at Rensselaer had also received threatening/harassing calls and e-mails from Lee. (Id., ¶¶ 23, 24).

19. At the conclusion of the speakerphone call on December 22, 1999, Ursin reported to DMV Commissioner Jose Salinas what had transpired in connection with Gordon's fax and her allegations. (Id., ¶ 25).

20. Lee was not at work on December 22, 1999 and was not due back at work until January 3, 2000. (Id., ¶ 25; Ex. 16,Lee depo. at p. 145).

21. Commissioner Salinas and Ursin both viewed Gordon's allegations as being extremely serious. In addition to the Lottery shootings in 1998, DMV staff itself was regularly exposed to physical and verbal threats. In the preceding decade, DMV had experienced two shooting incidents: one at the Wethersfield office and one at Norwich with accompanying critical injury. (Ex. 2, Ursin Aff., ¶ 27).

22. The Lottery shootings in 1998 resulted in Governor Rowland's promulgation of Executive Order No. 16 in August of 1999. Executive Order No. 16

provided for a zero tolerance policy for "violence or the threat of violence by or against any employee or member of the public." Executive Order No. 16 specifically prohibits state employees from ". . . threatening to cause death or physical injury to any individual in a state worksite." (Ex. 2, Ursin Aff., ¶ 28; Ursin Ex. "2B").

23.     The Commission on Human Rights and Opportunities ("CHRO") recognized in its May 6, 2002 No Reasonable Cause/Administrative Dismissal of Lee's discrimination complaint that "threatening remarks that may have been tolerated before the March 6, 1998 Connecticut State Lottery shootings, are no longer tolerated as provided in Executive Order Number 16 . . . . " (Exhibit 8, CHRO No Reasonable Cause/Administrative Dismissal May 6, 2002, CHRO No. 0010280, EEOC No. 16aa01132, at p. 6).

24.     Commissioner Salinas and Ursin also viewed the Gordon allegations as extremely serious because the activity described in the allegations contravened a DMV policy initiative issued by Commissioner Salinas which placed particular emphasis on the importance of DMV staff maintaining the utmost degree of dignity and respect towards members of the public and co-workers. Commissioner Salinas had recently disseminated the directive outlining DMV's expectation that each employee at all times maintain a respectful workplace. (Ex. 2, Ursin Aff., ¶ 29).

25.     Steve Shonta and Detective Edward Daly were assigned to investigate the Gordon allegations and report their findings. (Id., ¶ 30).

26. On or immediately after December 27, 1999, Shonta and Daly reported back that they had been able to conduct an extensive investigation which included audits of DMV computer and telephone records and witness interviews. Shonta and Daly also provided DMV with sworn statements from Gordon and two of her Rensselaer co-workers, Elaine Kendall and Jennifer Carone. (Ex. 2, Ursin Aff., ¶ 31; Ursin Exhs. "2C", "2D", and "2E").

27. Kendall's sworn witness statement, dated December 27, 1999, related that she was a Kelly Temporary Services worker assigned to Rensselaer as a receptionist. Kendall stated that on December 20 or 21 of 1999 she answered Rensselaer's phone and the caller identified himself as "Tony" and stated he wanted to speak to Sharon Gordon. Kendall stated further that she put the call through to Sharon Gordon but that a short time later the call came back to Kendall. At that time, the caller stated to Kendall: "tell that bitch I'm going to come down there and hurt her. There's nothing you or anyone else can do to stop this." (Ursin Aff., Exh. "2C").

28. The sworn statement Kindall provided to Shonta and Daly further asserted that shortly after the first threat, the same caller called back a second, third and fourth time that same morning repeating the threat. (Id.)

29. Kendall reported to Shonta and Daly at the time of her interview that the caller's threats had put her in fear for her personal safety. (Ex. 2, Ursin Aff., ¶ 32).

30.  Kendall further stated to Shonta and Daly at her interview that after she received the telephoned threats against Gordon, she telephoned her supervisor at Kelly Temps to report the incidents and was advised to contact the Rensselaer supervisor, which she did.  (Id.)

31.  Shonta and Daly also reported that they interviewed Sharon Gordon in the course of their investigation and obtained a statement from her dated December 30, 1999.  (Ex. 2, Ursin Aff., ¶ 33; Ursin Aff., Ex. "2D").

32.  Gordon's statement appeared to corroborate Kendall's account of the telephoned threats by "Tony" and further identified "Tony" as being a name utilized by Lee.  Gordon further stated that on or about December 20, 1999, a co-worker, Jennifer Carone, came to her and appeared upset regarding an e-mail Carone had received from "Tony Sexx." (Ursin Aff., Ex. "2D").

33.  Gordon described the history of her relationship with Lee as "stormy" and further stated that she feared for her safety and her family's safety as a result of the threats by Lee.  (Id.)

34.  Shonta and Daly further reported that they had obtained the statement of a third Rensselaer employee, Jennifer Carone, during the course of their investigation on December 27, 1999.  Carone recounted receiving e-mails from VLee@power99 of a personal nature during State of Connecticut work hours.  (Ex. 2, Ursin Aff., Ex. "2E").

35.  Shonta and Daly reported further that during the course of their investigation they had procured telephone records for Lee's state telephone number at

8

DMV. These telephone records which Shonta and Daly provided disclosed that Lee had made approximately fourteen (14) separate telephone calls from his state telephone to Rensselaer between 9:51 a.m. and 11:04 a.m. on December 21, 1999. (Ex. 2, Ursin Aff., ¶ 36; Exhibit 18, Extension Detail Report for DMV Telephone #(860) 263-5263 assigned to Vincent Lee, dated 12-21-99).

36. Shonta and Daly further reported that during the course of their investigation they obtained DMV computer usage records which revealed that Lee was maintaining an unauthorized personal internet e-mail account on his state computer (www.power99.com) under the e-mail name of Tony Sexx. This use of the state computer by Lee was in violation of the DMV's Commissioner's written policy concerning the proper use of state equipment. (Ex. 2, Ursin Aff., ¶ 35).

37. After receiving the details of Shonta's and Daly's investigative report, Ursin conferred with Commissioner Salinas. (Ex. 2, Ursin Aff., ¶ 36).

38. Commissioner Salinas directed that Lee should be given notice that DMV was contemplating disciplinary action in view of the investigation's findings and that Lee be afforded the opportunity to submit any evidence in mitigation of disciplinary charges at the earliest possible time upon his scheduled return to work on January 3, 2000. (Ex. 2, Ursin Aff., ¶ 37; Ursin Aff. Ex. "2F").

39. When Lee returned to work on January 3, 2000 he was provided with DMV's Loudermill notice advising him to appear with his representatives on January 5, 2000 to present material and information concerning why DMV's contemplated disciplinary action of discharge should not be taken. The letter detailed the disciplinary

charges pending and placed Lee on administrative leave with pay pending the Loudermill. (Ursin Aff., Ex. "2F").

40.     The disciplinary charges set forth in the Loudermill letter from Steven Shonta delivered to Lee on January 3, 2000 were: (1) engaging in offensive and abusive conduct towards members of the public; (2) deliberately violating Agency policies; and (3) engaging in activities that are detrimental to the interests of the Department of Motor Vehicles and State of Connecticut. (Id).

41.     The specific conduct alleged to have resulted in the violations set forth in DMV's Loudermill letter provided Lee on January 3, 2000 was: (1) deliberate misuse of state telephones and computer in violation of established policy; (2) harassment and threatening members of the public in violation of Governor's Executive Order and DMV policy; (3) misuse of state time to conduct personal business. (Id).

42.     The disciplinary charges pending against Lee on January 3, 2000 were unprecedented. No DMV employee had been charged with similar disciplinary violations by DMV previously. (Ex. 2, Ursin Aff., ¶ 45; Exhibit 11, Freund letter to Alfreda Gaither; Exhibit 15, DMV's response to Plaintiff's Interrogatories at p. 9, Response to No. 5).

        C.     **The Loudermill Meeting and Decision to Discharge**

43.     Lee appeared at the Loudermill meeting on January 5, 2000 along with two union representatives, Tucker and Collucci. DMV representatives at the meeting were Shonta, Ursin and Dodge. (Ex. 16, Lee depo. at p. 148; Ex. 2, Ursin Aff., ¶ 39).

44. The January 5, 2000 Loudermill meeting lasted approximately three (3) hours. During the meeting, Lee admitted making telephone calls and sending e-mails to Kendall, Gordon and Carone at Rensselaer on the day and at the times the threats were alleged to have been received. (Ex. 2, Ursin Aff., ¶ 40).

45. At the Loudermill meeting on January 5, 2000, Lee stated be could not recall the specific words he used in his telephone conversations with Kendall and Gordon. (Id).

46. At no time during the January 5, 2000 Loudermill meeting, or any subsequent meeting with DMV representatives prior to his discharge, did Lee deny making the physical threats. (Id),

47. After his termination on January 10, 2000, Lee admitted in his CHRO complaint dated February 4, 2000, that on December 21, 1999 "[Lee] left word with the [Rensselaer] receptionist at her place of employment to tell my ex-girlfriend (black/female) to stop calling and harassing me before I come down there." (Exhibit 3, CHRO Affidavit of Illegal Discriminatory Practice, Vincent F. Lee, February 4, 2000, at ¶ 7(a)).

48. At the January 5, 2000 Loudermill meeting, Lee and his representatives presented information and material to DMV. Lee stated that his relationship with Gordon had been a tempestuous one. Lee presented a copy of a court restraining order he had obtained against Gordon on January 4, 2000, the day before the Loudermill. Lee also presented a police report dated November 18, 1998 in connection with a complaint he

11

had made. (The report did not identify the alleged perpetrator). DMV representatives listened to a tape recording from Lee's home answering machine with a female voice, identified by Lee as Gordon, yelling obscenities. The voice's identity could not be independently verified due to the tape's poor quality. Lee also presented flyers and photographs as evidence of his harassment by Gordon. The DMV representatives thereafter determined that nothing in the flyers or photographs substantiated claims as to authenticity, dates or individuals alleged to have been involved. (Ex. 2, Ursin Aff., ¶ 41).

49.    On January 5, 2000, Lee and his representatives were advised by the DMV representatives that the material and information presented by Lee at the Loudermill did not substantially counter any of the findings of Shonta's and Daly's investigation. However, Lee and his representatives were advised by the DMV representatives that the Loudermill meeting would be continued five (5) days to January 10, 2000 in order to afford Lee additional time to any other material or information in response to the charges. (Ex. 2, Ursin Aff., ¶ 42; Ex. 16, Lee depo. at pp. 153-155).

50.    When the Loudermill meeting reconvened on January 10, 2000, Lee and at least one of his union representatives was present. Lee's representative stated that there would be no additional mitigating information forthcoming. (Id., ¶ 43; Ex. 16, Lee depo. at p. 155).

51.    As a result of all the information available on January 10, 2000 concerning DMV's disciplinary charges against Lee, Ursin believed that Lee had engaged in the activity underlying the DMV charges. Ursin believed that these charges were extremely

serious and warranted Lee's discharge for the reasons stated in the Loudermill letter of January 3, 2000. (Ex. 2, Ursin Aff., ¶ 44; Ursin Aff. Ex. "2F").

52.	Ursin conferred with Commissioner Salinas and advised the Commissioner of his belief that the charges pending against Lee had been substantiated and his recommendation for discharge. (Ex. 2, Ursin Aff., ¶ 44).

53.	Commissioner Salinas adopted Ursin's recommendation and made the decision to terminate Lee. Lee's termination letter was thereupon issued by Steve Shonta, Principal Personnel Officer, on January 10, 2000, to be effective as of January 25, 2000. The termination letter detailed DMV's findings regarding the disciplinary charges. (Ex. 2, Ursin Aff., ¶ 44; Ursin Aff. Ex. "2G").

54.	Ursin recommended to Commissioner Salinas that Lee's termination was warranted because the charges which he believed had been substantiated against Lee were unprecedented in his experience at DMV and in direct violation of Executive Order No. 16 and the DMV "Respect in the Workplace" policy issued by the Governor and Commissioner just months before. (Ex. 2, Ursin Aff., ¶¶ 45, 46; Exhibit 8, CHRO No. Reasonable Cause Finding, May 6, 2002 at pp. 6, 8).

**D.	The Arbitration Proceeding And Imposition of Sixty (60) Day Suspension In Lieu of Termination**

55.	Lee filed a grievance relative to his termination pursuant to the provisions of his union's collective bargaining agreement with the State of Connecticut. The

grievance was ultimately heard by an independent Arbitrator in binding arbitration. (Exhibit 12, Award and Opinion).

56.     The issue presented to the Arbitrator was whether Lee had been dismissed for just cause under the provisions of the collective bargaining agreement and, if not, what remedy shall be ordered consistent with that agreement. (Id., p.1).

57.     The Arbitration proceeding convened on multiple days commencing June 23, 2000 and concluding November 20, 2000. (Id).

58.     During the arbitration proceeding, the Arbitrator heard testimony from a number of witnesses including Kendall and Gordon. Lee, however, did not testify. (Id).

59.     In his decision dated April 12, 2001, the Arbitrator found that inconsistencies in the testimony of Kendall and Gordon at arbitration undermined their credibility as to their allegations of harassment and threats by Lee. (Id. pp, 25, 27).

60.     The Arbitrator did find that Lee misused state telephone and computer for purposes of non-work related business "in excess" and that the Lee's calls to Rensselaer went beyond sheer misuse of the phones and therefore "constituted evidence that [Lee] permitted his personal life to invade and affect his work beyond that which could be considered reasonable and therefore justified discipline." (Id. pp. 24, 25).

61.     The Arbitrator concluded that Lee's termination should be reduced to a sixty (60) calendar day suspension without pay or benefits and that Lee should therefore be reinstated to his former position. (Id. p. 27).

62. Lee was reinstated by DMV to his position of Management Analyst 2 in late April or May of 2001 in the Emissions Division and reimbursed for lost pay per the Arbitration Award. (Ex. 16, Lee depo. at p. 180).

63. Lee felt that when he returned to work in May of 2001, he was ostracized by DMV management because he received bad "vibes". (Ex. 16, Lee depo. at p. 182).

64. Prior to January of 2003, the position of Management Analyst 2 had been "red circled" by the Department of Administrative Services ("DAS"). Red circling meant that the classification was being considered for abolition and that vacancies in such classification could not be filled without specific permission from DAS. (Ex, 16, Lee depo. at pp. 43, 44).

65. In January of 2003, the state's fiscal crisis caused lay offs on a statewide basis. The Management Analyst classification was identified by the State for statewide layoff. In accordance with directives it received, DMV was obliged to lay off all of its Management Analysts, including Mr. Lee. (Exhibit 15, at pp. 16, 19, Responses to Interrogatories Nos. 16 and 20; Ex. 16, Lee depo., p. 188).

### E. The Commission on Human Rights and Opportunities Proceedings On Lee's Claims of Discrimination.

66. By Affidavit of Illegal Discriminatory Practice dated February 4, 2000, Lee dual filed a discrimination complaint with the CHRO and EEOC. Lee alleged in his CHRO complaint that his termination by DMV was discriminatory on the basis of his race and sex. (Ex. 3, Affidavit of Illegal Discriminatory Practice, February 4, 2000).

15

67. On June 12, 2000, Lee filed an "Addendum" to his February 4, 2000 complaint with the CHRO. (Exhibit 4, Addendum filed June 12, 2000).

68. On June 13, 2000, Lee filed another "Addendum" to his February 4, 2000 complaint with CHRO. (Exhibit 5, Addendum filed June 13, 2000).

69. The "Addendums" filed by Lee were almost identical. (Exhibits 4 and 5).

70. The CHRO did not consider either of these "Addendums" as amendments to Lee's February 4, 2000 complaint nor did the CHRO consider that Complainant had properly raised a claim that his termination in January of 2000 had been in retaliation for his opposition to discrimination. (Ex .10, at p. 6, CHRO Rejection and Decision dated December 2, 2002).

71. Lee's February 4, 2000 complaint was originally dismissed by CHRO on June 21, 2000, after a merit assessment determination (MAR) pursuant to Conn. Gen. Stat. § 46a-83(b). The CHRO concluded that there was no reasonable possibility that further investigation of Lee's complaint would result in a finding of reasonable cause. (Exhibit 6, MARs dismissal, June 21, 2000).

72. Following the MAR's dismissal, CHRO granted Lee's request for reconsideration apparently based on the issuance of the Arbitrator's decision. (Exhibit 7, Notice of Reconsideration of Dismissal, dated June 21, 2001).

73. Thereafter, the CHRO investigated further the allegations of discrimination by Lee. The CHRO Investigator conducted a fact finding proceeding on

16

February 26, 2002 at which time she heard the testimony of Lee, Ursin, Freund, Micelli and Cosgrove representing DMV. (Exhibit 8, No Reasonable Cause Finding, May 6, 2002 at p. 5).

74. The Investigator's No Reasonable Cause finding found that DMV's explanation of its reasons underlying Lee's termination were credible and non-pretextual. (Ex. 8, at p. 6).

75. The CHRO Investigator also found that none of the comparators of Lee who Lee proffered as non minority employees receiving more favorable treatment were, in fact, similarly situated. The Investigator relied on interviews with employees Driscoll and Puglielli and contemporaneous notes written by Shonta in determining that Driscoll was not similarly situated to Lee. (Ex. 8, at p. 6; Ex. 9; Ex. 17, Driscoll depo. at pp. 11-14).

76. The CHRO determined that the critical issue in connection with Lee's discrimination complaint was whether it was reasonable for DMV to conclude, at the time it made its decision to terminate, that Complainant had engaged in the threatening and harassing conduct. The CHRO decided that it was not the credibility of Kendall, Gordon and Carone, the Rensselaer employees, at the arbitration proceeding that was at issue, but the reasonableness of DMV's conclusions on evidence available at the time of termination. (Ex. 10, CHRO Rejection and Decision, December 2, 2002 at p. 5; Ex. 19, CHRO Response at p. 1).

       DEFENDANTS

       STATE OF CONNECTICUT,
       DEPARTMENT OF MOTOR VEHICLES,
       DALE URSIN

       RICHARD BLUMENTHAL,
       ATTORNEY GENERAL

By: _____
     Edward F. Osswalt
     Assistant Attorney General
     Federal Bar No. ct15252
     55 Elm Street - P.O. Box 120
     Hartford, CT 06141-0120
     Tel: (860) 808-5340
     Fax.: (860) 808-5383
     Email: Edward.Osswalt@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts was sent via United States mail, first class postage prepaid, this 26th day of January, 2005 to:

Kimberly A. Graham, Esq.
621 Farmington Avenue
Hartford, CT 06105
Tel.: (860) 523-9306

_____
Edward F. Osswalt
Assistant Attorney General