UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------x
                                :
VINCENT LEE,                    :
                                :
          Plaintiff,            :
                                :
v.                              :   Civil No.3:02CV02214(AWT)
                                :
STATE OF CONNECTICUT,           :
DEPARTMENT OF MOTOR VEHICLES,   :
and DALE URSIN,                 :
                                :
          Defendants.           :
                                :
-------------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Vincent Lee ("Lee"), brings this action against the State of Connecticut Department of Motor Vehicles ("DMV") and Dale Ursin in his individual capacity. The First Claim for Relief set forth in the Third Amended Complaint (Doc. No. 19) ("Amended Complaint") alleges that the DMV intentionally discriminated against Lee in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). The Second Claim for Relief alleges that the DMV retaliated against Lee in violation of Title VII. The Third Claim for Relief alleges that Ursin, acting under the color of law, intentionally discriminated against Lee in violation of his constitutional right to equal protection provided by the 14th Amendment to the United States Constitution. The Fourth Claim for Relief alleges that

Ursin intentionally discriminated against Lee, a "class-of-one" plaintiff, without any rational basis for doing so in violation of his constitutional right to equal protection provided by the 14th Amendment to the United States Constitution. The defendants have moved for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is being granted.

## I.   FACTS

Lee is an African-American male, who was employed by the DMV as a Management Analyst from 1992 until his termination on January 10, 2000. Following an arbitration proceeding, Lee was reinstated in May 2001 and continued to work as a Management Analyst until he was laid off in January 2003. From 1992 to 1997, Lee worked under several different supervisors. In 1998, Steve Dodge ("Dodge") became Lee's immediate supervisor. At that time, Dodge was supervised by Charles Micelli, who was supervised by Ursin.

In November 1999, Lee expressed a concern to Ursin that he had not been invited to attend a Business Process Management meeting. Lee did not express to Ursin any belief that he had been excluded from the meeting because of his race.

On December 22, 1999, the DMV Human Resources Unit received a fax addressed to "Human Resources Director" from an individual named Sharon Gordon ("Gordon"). The fax consisted of four pages and had a cover sheet from "Rensselaer at Hartford." The fax

2

stated:

> I'm sending this fax to the dept. of motor vehicles dept.
> hoping that I can get this problem resolved.  I'm
> receiving threatening phone calls on my life and my
> family from Mr. Vincent Lee who works in the dept. of
> human resource development dept. yesterday I along with
> another co-worker received a e-mail from Mr. Lee from his
> workplace, which we found very strange being that we did
> not personally give Mr. Lee this information.  I would
> like to see this matter taken care of.

(Def. Loc. R. 56(a)(1) Statement, Ex. 2A.)  Ursin received and

reviewed this fax on December 22, 1999.  On the afternoon of

December 22, Ursin telephoned Gordon to inquire about information

contained in the fax.  Steve Shonta ("Shonta"), DMV's Principal

Personnel Officer for Labor Relations, and Anne Fairbanks,

Personnel Assistant, listened to the conversation between Ursin

and Gordon on speakerphone.  During the December 22, 1999

speakerphone conversation, Gordon told Ursin that Lee was

threatening her and her family and that she wanted the threats to

stop.  Gordon also stated that she and Lee had previously been

involved in a relationship and that he had contacted her multiple

times throughout the day.  Gordon stated that she attempted to

stop the calls and e-mails when they became too "perverted."

Finally, Gordon stated that two of her co-workers had also

received threatening and harassing calls and e-mails from Lee.

Following this telephone call, Ursin reported the substance of

Gordon's fax and allegations to the DMV Commissioner, Jose Salinas

("Salinas").  Shonta and Detective Edward Daly ("Daly") were then

assigned to investigate Gordon's allegations and report their

3

findings.

     As part of their investigation, Shonta and Daly audited
certain DMV computer and telephone records and conducted several
witness interviews.  In late December 1999, Shonta and Daly
reported their findings to Ursin, who later relayed them to
Salinas.[1]  Shonta and Daly reported that one of Gordon's co-
workers, Elaine Kendall ("Kendall"), stated under oath that on
December 20 or 21 of 1999 she answered the telephone at Rensselaer
and a caller identified himself as "Tony" and stated that he
wanted to speak to Gordon; Kendall transferred the call to Gordon.
According to Kendall, the call was then re-transferred back to her
telephone and the caller stated: "Tell that bitch I'm going to
come down there and hurt her.  There's nothing you or anyone else
can do to stop this."  (Def. Loc. R. 56(a)(1) Statement, Ex. 2C.)
Additionally, Kendall stated that the same caller called back
several times that morning and repeated the same threat.  Shonta
and Daly also obtained a sworn statement from Gordon, which
appeared to corroborate Kendall's account of the threatening
telephone call described above.  In her statement, Gordon
identified "Tony" as a name utilized by Lee and stated that she
feared for her safety and her family's safety as a result of Lee's

---

[1] The plaintiff contends that the investigation failed to
yield any credible evidence that Lee behaved in a threatening or
harassing manner.  However, the plaintiff does not deny that
Shonta and Daly reported their findings to Ursin, who relayed them
to Salinas.

4

threats.  Shonta and Daly also obtained a sworn statement from
Jennifer Carone ("Carone"), another co-worker of Gordon's.  Carone
stated that she had received emails of a personal nature from
VLee@power99 during State of Connecticut working hours.  Shonta
and Daly further reported that telephone records for Lee's state
telephone number indicated that 14 separate telephone calls had
been made from his state telephone number to Rensselaer between
9:51 a.m. and 11:04 a.m. on December 21, 1999.  DMV computer usage
records indicated that Lee maintained a personal internet e-mail
account on his state computer under the e-mail name "Tony Sexx."

    In response to these findings and at Salinas' direction, the
DMV issued a "Loudermill" notice to Lee informing him that the DMV
was considering taking disciplinary action against him.  This
notice instructed Lee to appear with his representatives on
January 5, 2000 to present material and information as to why the
DMV's contemplated disciplinary action should not be taken.
According to the notice, it was alleged that Lee 1) deliberately
misused state telephones and computer in violation of established
policy, 2) harassed and threatened members of the public in
violation of Governor's Executive Order and DMV policy, and 3)
misused state time to conduct personal business.  The notice
informed Lee that this conduct gave rise to the following
disciplinary charges:  1) engaging in offensive and abusive
conduct towards members of the public, 2) deliberately violating
Agency policies, and 3) engaging in activities detrimental to the

5

interests of the DMV and State of Connecticut.  The notice
effectively placed Lee on leave with pay pending the January 5,
2000 hearing (the "Loudermill hearing").

At the Loudermill hearing, Lee admitted making telephone
calls and sending e-mails to Kendall, Gordon and Carone at
Rensselaer on the days and at the times the threats were alleged
to have been made.[2]  At no time during the Loudermill hearing or
any subsequent meeting with DMV representatives prior to his
discharge did Lee deny making the physical threats.[3]  In his CHRO
affidavit, Lee admitted that on December 21, 1999 he "left word
with the receptionist [at Rensselaer] to tell my ex-girlfriend
(black/female) to stop calling and harassing me before I come down
there." (Pl. Loc. R. 56(a)(1) Statement, Ex. P.)  At the
Loudermill hearing, Lee presented evidence that Gordon had

_____

[2] Lee denies making these admissions at the Loudermill
hearing, but presents no evidence in support of his denial.
Instead, he directs the court to his CHRO affidavit dated February
4, 2000.  In ¶ 15 of the CHRO affidavit, Lee stated that when he
was initially confronted with the allegations on January 3, 2000
he denied having threatened or harassed anyone.  However, the CHRO
affidavit does not support his denial of the defendants' statement
that at the Loudermill hearing on January 5, 2000 he admitted
making calls and sending e-mails on the day and times that the
threats were alleged to have been made.

[3] Lee denies that at the Loudermill hearing or subsequent
meetings with DMV representatives he failed to deny making the
physical threats.  Again, he directs the court to his CHRO
affidavit in which he states that he denied making the threats
when he was initially confronted with the allegations on January
3, 2000.  The CHRO affidavit does not support his claim that he
denied the allegations at the Loudermill hearing and subsequent
meetings.

harassed him in the past, but the DMV representatives informed him that such evidence did not substantially counter Shonta's and Daly's findings. The Loudermill hearing was continued until January 10, 2000 to allow Lee to collect and present additional evidence as to why the DMV should not take disciplinary action against him. When the Loudermill hearing reconvened on January 10, 2000 Lee failed to present any additional evidence.

Based on all the information available to Ursin following the completion of the hearing on January 10, 2000, he believed that Lee had engaged in the conduct charged in the Loudermill notice. Based on his conclusion that Lee had, in fact, engaged in such conduct, Ursin recommended to Salinas that the DMV discharge Lee. Salinas adopted Ursin's recommendation and made the decision to discharge Lee. The discharge was effected by issuance of a letter of termination dated January 10, 2000.

On February 4, 2000, Lee filed a complaint with the CHRO and EEOC alleging that the DMV had illegally terminated him on the basis of his race and sex. After conducting a merit assessment determination, the CHRO concluded that there was no reasonable possibility that further investigation of the allegations in Lee's complaint would result in a finding of reasonable cause and dismissed the complaint.

However, pursuant to the provisions of his union's collective bargaining agreement, Lee also filed a grievance contesting his termination. The grievance was heard by an

7

arbitrator on multiple days between June 23, 2000 and November 20, 2000.  During the arbitration proceeding, the arbitrator heard testimony from a number of witnesses including Kendall and Gordon. By a written decision dated April 12, 2001, the arbitrator found, inter alia, that inconsistencies in the testimony of Kendall and Gordon undermined their credibility as to their allegations of harassment and threats by Lee.  Additionally, while the arbitrator did not find that Lee's conduct constituted threats or harassment, he concluded that "[Lee] used the State's phone and computer for purposes of non-work related business in excess and therefore the conduct justified discipline." (Pl. Loc. R. 56(a)(1) Statement, Ex. M.)  In light of these findings, the arbitrator determined that Lee's termination should be reduced to a 60-day suspension without pay or benefits and that Lee should thereafter be reinstated to his former position.  Lee was reinstated in by DMV to his position of Management Analyst II in late April or May of 2001.

Following the arbitrator's decision, the CHRO granted Lee's request for reconsideration and assigned a CHRO Investigator to further investigate Lee's allegations.  The CHRO Investigator conducted a fact-finding proceeding on February 26, 2002, and concluded that a determination of no reasonable cause was appropriate because the DMV reasonably concluded, based on the evidence available at the time it decided to terminate Lee, that he had engaged in threatening and harassing conduct.

In January 2003, the State of Connecticut identified the classification of Management Analyst for state-wide layoffs.  The DMV was directed to lay off its Management Analysts, including Lee.

## II.  <u>**LEGAL STANDARD**</u>

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir. 1987); <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or

minor facts will not prevent summary judgment.  <u>See</u> <u>Howard v.</u>
<u>Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d
33, 41 (2d Cir. 2000) (quoting <u>Del. & Hudson Ry. Co. v. Consol.</u>
<u>Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the non-movant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the non-movant must
be supported by the evidence.  "[M]ere speculation and conjecture"
is insufficient to defeat a motion for summary judgment.  <u>Stern v.</u>
<u>Trustees of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997)
(quoting <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118,
121 (2d. Cir. 1990)).  Moreover, the "mere existence of a
scintilla of evidence in support of the [non-movant's] position"
will be insufficient; there must be evidence on which a jury could
"reasonably find" for the non-movant.  <u>Anderson</u>, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary judgment
is to go beyond the pleadings to determine if a genuine issue of
material fact exists.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324.
"Although the moving party bears the initial burden of

11

establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the non-movant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the non-movant fails to meet this burden, summary judgment should be granted. The question then becomes:  is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

III.  **DISCUSSION**

    A.  **Title VII Claims**

        1.  **Race Discrimination**

In order to survive a motion for summary judgment, a Title VII plaintiff alleging that he was discharged on the basis of his race must establish a prima facie case by demonstrating that (1) he is a member of a protected group; (2) he was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Fisher v. Vassar College, 114 F.3d 1332, 1344 (2d Cir. 1997).

For purposes of the instant motion, the defendants concede that the plaintiff can establish the first three elements of a prima facie case; they dispute only whether Lee's discharge occurred under circumstances giving rise to an inference of discrimination. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island Railroad, 230 F.3d 34, 40 (2d Cir. 2000). "To be 'similarly situated' the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). "What constitutes 'all material respects' . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. . . . Hence the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical." Graham, 230 F.3d at 40 (citations omitted).

In opposition to the defendants' motion for summary

judgment, Lee contends that he received harsher disciplinary treatment than other, white DMV employees to whom he was similarly situated. However, Lee fails to present evidence that the DMV employees he identifies engaged in conduct that bears a "reasonably close resemblance" to the conduct for which he was discharged. In its termination letter to Lee, the DMV stated:

> It has been determined that you have deliberately misused State telephones and a computer in direct violation of established policy and have harassed and threatened members of the public in direct violation of the Governor's Executive Order and Department policies. The harassment noted above includes sexual harassment. You have also misused State time to conduct personal business.

(Pl. Loc. R. 56(a)(1) Statement, Ex. L.) None of the other DMV employees identified by Lee engaged in conduct that bears a "reasonably close resemblance" to the conduct described by the DMV in the termination letter. Lee directs the court specifically to the experiences of five DMV employees. First, Lee contends that DMV employee John Roberts ("Roberts"), an alleged similarly situated white male, received a relatively less severe sanction when he was charged with misuse of the state's computer system in June 2000. Roberts was alleged to have used the State Police Collect System to obtain the birth-dates of his father and girlfriend. Roberts acknowledged that his actions had been inappropriate and promised that he would not repeat this behavior. The DMV issued Roberts a formal letter of reprimand. Second, Lee contends that DMV employee Michael Boguslawski ("Boguslawski"), an alleged similarly situated white male, received a relatively less

severe sanction when he was charged principally with misuse of state resources by utilizing a state vehicle for personal business.  Boguslawski acknowledged and apologized for his conduct.  The DMV entered into a performance agreement with Boguslawski – "a 'last chance' opportunity provided to [him] in lieu of termination" (Pl. Loc. R. 56(a)(1) Statement, Ex. N.) – whereby Boguslawski agreed not to engage in similar conduct in the future.  Third, Lee contends that DMV employee Mark Niglio ("Niglio"), an alleged similarly situated white male, received a relatively less severe sanction when he was charged with misuse of agency letterhead in June 2000.  The DMV issued Niglio a written warning in response to his conduct.  Fourth, Lee contends that DMV employee Louis Florio ("Florio"), an alleged similarly situated Hispanic male, received a relatively less severe sanction when he was alleged to have misused a State telephone by using it to make 71 personal calls in February 1994.  Florio had been found to have illegally used dealer plates in 1985.  With respect to the allegation that he had misused a State telephone, Florio received a written warning.  Fifth, Lee contends that DMV employee Carol Driscoll ("Driscoll"), an alleged similarly situated white female, received a relatively less severe sanction when a co-worker alleged that she held her fist in the co-worker's face in November 2000.  The co-worker withdrew this allegation the day after it was made.  Both parties exchanged apologies and no disciplinary action was taken against Driscoll.

15

It is undisputed that Lee and the DMV employees identified by him were subject to the same workplace standards.  As to whether the conduct for which the DMV terminated Lee was of comparable seriousness to that of the other DMV employees discussed above, the court considers the facts and circumstances of Lee's and the other employees' conduct.  Of the DMV employees identified by Lee, only Driscoll's conduct could be described as threatening or harassing.  The other employees (i.e., Roberts, Boguslawski, Niglio and Florio) were charged with conduct that can generally be characterized as misuse of State resources.  They were neither charged with nor found to have engaged in threatening or harassing behavior.  See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001) (not similarly situated where plaintiff, like other employees, failed to produce new business, but, unlike other employees, submitted reports late, submitted poorly prepared reports and failed to provide leadership).  Unlike these DMV employees, Lee was actually found by the DMV to have committed the violations charged.  Moreover, none of the employees identified by Lee were alleged to have engaged in misuse of state resources and threatening and harassing conduct.  Because the conduct of these DMV employees and Lee is not comparably serious, Lee is not similarly situated to them.

Nor is Lee similarly situated to Driscoll.  First, the DMV did not make a finding as to whether Driscoll actually raised her fist to a co-worker.  In this case, the DMV conducted an

16

investigation and determined that Lee had, in fact, engaged in
threatening and harassing behavior.  Second, the only allegation
against Driscoll was that she had raised her fist to a co-worker.
Unlike Lee, Driscoll was not alleged to have also misused State
computer equipment, telephone equipment and time.  Third, the
alleged threats made by Lee are more serious than Driscoll's
alleged threatening behavior.  It was reported to DMV officials
that Lee threatened Gordon's life and her family.  In contrast,
Driscoll was alleged to have raised her fist toward a co-worker,
who then simply walked away.  Fourth, Kendall, one of the victims
of Lee's threatening behavior, stated to DMV officials that she
feared for her personal safety after being told by Lee to relay
the threats to Gordon.  (Pl. Loc. R. 56(a)(1) Statement, Ex. H.)
The alleged victim of Driscoll's threatening behavior promptly
withdrew the complaint and the parties exchanged apologies.
Accordingly, there is no genuine issue of material fact as to
whether Lee's conduct is comparably serious to Driscoll's, and the
facts show that they are not similarly situated employees.

     Having determined that Lee is not similarly situated to any
of the DMV employees whom he has identified, the court need not
address his argument that the DMV's legitimate, non-discriminatory
reason for the discharge is mere pretext for discrimination.  He
has failed to show that he was treated differently than other
similarly situated employees and thus cannot satisfy the fourth
element of the prima facie case, i.e., that he was discharged

17

under circumstances giving rise to an inference of discrimination.

### 2.    Retaliatory Discharge

"To establish a <u>prima facie</u> case of retaliation, the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282-83 (2d Cir. 2001) (<u>citing</u> <u>Gordon v. N. Y. City Bd. of Educ.</u>, 232 F.3d 111, 113 (2d Cir. 2000)). "To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII. However, the plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" <u>Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons</u>, 842 F.2d 590, 593 (2d Cir. 1988) (internal citations omitted).

Lee contends that he was discharged in retaliation for complaining to Ursin about his exclusion from a November 1999 meeting of a Business Project Management group. According to Lee, this complaint to Ursin constituted protected activity and satisfies the first element of his <u>prima facie</u> case. However, while the record supports Lee's claim that he complained to Ursin about not being invited to the meeting, there is no evidence that he informed Ursin of his belief that he was excluded because of

18

his race.  See Manoharan, 842 F.2d 590, 594 (plaintiff did not

prove "good faith" belief where initial complaint to employer

failed to "point out discrimination against particular

individuals" or discriminatory practices, as they were alleged).

Lee implies, without explicitly stating, that he complained to

Ursin that he was not invited to the meeting because of this race.

In support of this contention, Lee directs the court to the Third

Amended Complaint, the Addendum to the CHRO Complaint and the

Ursin Affidavit.  The Third Amended Complaint states in relevant

part:

> In November, 1999, approximately sixty days prior to his
> termination, plaintiff complained to his supervisor, Dale
> Ursin that he, (plaintiff) was being treated differently
> and requested an explanation as to the reason for such
> disparate treatment.

(Pl. Loc. R. 56(a)(1) Statement, Ex. J.)  There is no allegation

that Lee expressed a belief that the basis for the alleged

disparate treatment was his race, and in any event, "an adverse

party may not rest upon the mere allegations or denials of the

adverse party's pleadings." Fed. R. Civ. P. 56(e).

The Addendum to the CHRO Complaint states in relevant part:

> Back in November of 1999 I encountered a situation that
> after much consideration I have come to believe presents
> a pattern of the cultural bias.  During a Process
> Improvement Event for the Employment Recruitment Process
> I was denied the opportunity to be present at a meeting
> to discuss the hot topic that was affecting the morale
> of other team members involved in improving the
> Recruitment Process of new employees. . . . After
> discovering the meeting had taken place without me, I
> made my feelings known to the Process Improvement
> Sponsor, Dale Ursin (white/male).  The Process

19

> Improvement Sponsor apologized for the over-sight and
> discussed my concerns with the Process Improvement Co-
> leader.    The  Process  Improvement  Co-leader  later
> apologized for his over-sight and promised that it would
> not happen again.

(Pl. Loc. R. 56(a)(1) Statement, Ex. Q) (emphasis added)  Again,

Lee's account of his complaint to Ursin does not state that he

expressed a belief that he was excluded due to his race.

Moreover, his addendum to the CHRO suggests that it was only

"after much consideration" that he came to believe that his

exclusion was motivated by racial animus.

Finally, Lee cites ¶¶ 10-13 of Ursin's affidavit in support

of his contention that he complained to Ursin that he was excluded

from the meeting because of his race.  In ¶ 10 of the affidavit,

Ursin states:

> . . . Mr. Lee expressed concern because he said he was
> a "co-facilitator on the project and felt he should have
> been invited.  At no time during this discussion did Mr.
> Lee state or imply, nor did I infer, that Mr. Lee's race
> had anything to do with his not being invited to the
> meeting.

(Pl. Loc. R. 56(a)(1) Statement, Ex. H.)  Clearly, Ursin's

affidavit does not support the conclusion that Lee communicated a

belief that he had been excluded from the meeting because of his

race.

Thus, there is no evidence that Lee informed Ursin of a

belief that he was excluded from the meeting because of his race,

nor any basis for inferring that, when he complained to Ursin, Lee

believed he was excluded from the meeting because of his race.

Consequently, he cannot establish that he held a good faith belief that his exclusion from the meeting violated the law.  Thus, Lee fails to satisfy the first element of a prima facie case, which requires his participation in protected activity.

In addition, Lee fails to satisfy the second element of a prima facie case, because there is no evidence that could support a conclusion that Ursin understood, or could have reasonably understood, that Lee was engaging in protected activity.  See Galdieri-Abrosini, v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)("implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could have reasonably understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

### B.  Equal Protection Claims

"To state a cause of action under § 1983, [the plaintiff] must allege (1) that the defendants deprived him of a right secured by the Constitution or the laws of the United States; and (2) that they did so under color of state law." Giordano v. City of New York, 274 F.3d 740, 750 (2d Cir. 2001) (quotations omitted).

Here, Lee pursues two equal protection theories: intentional discrimination based on race and selective enforcement.

### 1.  Race Discrimination

21

Lee asserts that Ursin, acting under color of state law, intentionally treated him differently from other similarly situated white DMV employees.  "An equal protection claim requires (inter alia) evidence from which a jury could find that the plaintiff was selectively treated as compared with others similarly situated."  Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 155 (2d Cir. 2006); see also Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998)("An employee is denied [his] equal protection rights to be free from . . . discrimination when [he] is treated differently from other similarly situated employees . . .").  "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, [the Second Circuit] borrow[s] the burden-shifting framework of Title VII claims."  Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1 (1993).

For the reasons discussed in Part III.A.1. above, Lee has failed to create a genuine issue of material fact to whether he was similarly situated to other white employees but nevertheless treated differently.

## 2.  Class-of-One

To prevail on a "class-of-one" equal protection claim, the plaintiff must demonstrate "(1) the person compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Giordano</u>, 274 F.3d 750-51.  The Second Circuit has not yet resolved the issue of whether "the Supreme Court's decision in <u>Olech</u> . . . removed the requirement that malice or bad faith be shown in order to state a valid 'class of one' equal protection claim."  <u>Harlen Associates v. Village of Mineola</u>, 273 F.3d 494, 499-500 (2d Cir. 2003).  However, the court need not reach the question of malicious intent because, as discussed in Part III.A.1 above, Lee has failed to created a genuine issue of material fact with respect to whether he was treated differently than other similarly situated white employees.

**IV.    <u>CONCLUSION</u>**

For the reasons set forth above the Defendants' Motion for Summary Judgment (Doc. No. 55) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 30th day of March 2006 at Hartford, Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge
